# EXHIBIT 1

**FILED**
**2nd JUDICIAL DISTRICT COURT**
**Bernalillo County**
**11/12/2019 12:44 PM**
**James A. Noel**
**CLERK OF THE COURT**
**Catherine Chavez**

STATE OF NEW MEXICO
COUNTY OF BERNALILLO
SECOND JUDICIAL DISTRICT COURT

Gavin Macgregor

      Plaintiff,

v.                                     No. D-202-CV-2019-08810

MiMedx Group Inc.

      Defendant.

## COMPLAINT

Plaintiff ("Mr. Macgregor"), through counsel, states:

1.  Mr. Macgregor is a resident of Bernalillo County, New Mexico.

2.  The Defendant ("MiMedx") is, upon information and belief, a Florida corporation
that has its principal place of business in Georgia.

3.  Mr. Macgregor's claims against MiMedx arise out of its transaction of
business and its tortious conduct within the State of New Mexico, such that this Court has
jurisdiction over MiMedx pursuant to NMSA 1978, §38-1-16.

## COUNT I
## INTENTIONAL MISREPRESENTATION

4.  In the Spring of 2019, Mr. Macgregor was employed as an account executive with
a medical device company, where he was earning a substantial income. At that time,
Mr. Macgregor was contacted by a MiMedx employee, who told Mr. Macgregor
of an employment opportunity at MiMedx. Mr. Macgregor then contacted MiMedx, and
arranged for an interview.

5.    In the communications that then took place between Mr. Macgregor and MiMedx, the MiMedx executive told Mr. Macgregor that, although his base salary would be significantly less than he was making at his then-current employer, the total compensation Mr. Macgregor could expect to earn at MiMedx would substantially exceed the total compensation he was then earning.

6.    MiMedx told Mr. Macgregor that the University of New Mexico Hospital ("UNMH") would be his primary anchor account, that Mr. Macgregor would be spending the majority of his time on the UNMH account, and that the UNMH account was generating more than $100,000 per year in commissions, almost exclusively the result of UNMH's purchases of a MiMedx product named "Epifix." MiMedx also provided Mr. Macgregor with figures and documentation showing the level of purchases UNMH had made from MiMedx over the last year, to support its representation that the UNMH account would generate approximately that level of commissions. MiMedx, however, actively concealed from Mr. Macgregor the fact that, shortly before such representations were made, UNMH had become dissatisfied with MiMedx, and that UNMH's plastic surgery and podiatry departments (which were the main purchasers of Epifix at UNMH) had stopped purchasing from MiMedx.

7.   MiMedx also actively concealed from Mr. Macgregor the fact that there was a significant "inventory overhang," both at UNMH, and also at the Veterans' Administration Hospital in Albuquerque (the "VA Hospital"); i.e., that those institutions had already purchased from MiMedx enough of MiMedx products (Epifix) to satisfy those customers' needs for a considerable period of time. As a consequence, when Mr. Macgregor became employed by MiMedx, he was required to spend a substantial amount of time focused upon both accounts' use

of the previously-purchased Epifix, even though the commission on that product had already been paid to a prior account executive.

8.   MiMedx also provided Mr. Macgregor with "account base" documentation which showed the various customer accounts that MiMedx told Mr. Macgregor would be assigned to him if he accepted employment with MiMedx.  Once he had accepted such employment, however, Mr. Macgregor was told by MiMedx that some of those named accounts had been assigned to another account executive.

9.   MiMedx also represented to Mr. Macgregor that there was an imminent opportunity to expand the amount of business that could be done with UNMH by developing sales of another MiMedx product named "Amniofill."  MiMedx concealed from Mr. Macgregor, however, that Amniofill was not among the products that had been approved for purchase by UNMH, and further concealed that there was no real prospect of UNMH's adding Amniofill to its list of approved products due to UNMH's overall dissatisfaction with MiMedx.

10. MiMedx also represented to Mr. Macgregor that there was an opportunity to expand the amount of business being done with the VA Hospital.  MiMedx concealed from Mr. Macgregor, however, the fact that the podiatry department at the VA Hospital had expressed dissatisfaction with MiMedx, and had effectively stopped purchasing MiMedx products.

11. MiMedx also concealed from Mr. Macgregor the fact that the commissions earned by the prior MiMedx account executive whom Mr. Macgregor would be replacing were, to a substantial degree, a result of that person's systematic violation of the Health Insurance Portability and Accountability Act of 1996 (HIPAA").

12.   MiMedx's misrepresentations of material acts to Mr. Macgregor as well as MiMedx's concealment of material facts from Mr. Macgregor were intentional and fraudulent.

13. Mr. Macgregor, in reasonable reliance upon MiMedx's false and fraudulent misrepresentations, was induced to resign from his prior employment and to enter into an employment agreement with MiMedx. A true copy of that Employment Agreement is attached as Exhibit 1.

14. After becoming employed by MiMedx, Mr. Macgregor diligently worked the accounts that had been assigned to him ,but earned only nominal commissions.

COUNT II.
NEGLIGENT MISREPRESENTATION

15. MiMedx failed to exercise reasonable care or competence in obtaining or communicating to Mr. Macgregor the information described above.

MiMedx had no reasonable ground for believing the representations it made to Mr. Macgregor were true.

16. MiMedx intended that Mr. Macgregor rely upon the material representations and failures to disclose referenced above, and Mr. Macgregor did so rely.

COUNT III.
BREACH OF COVENANT OF GOOD
FAITH AND FAIR DEALING

17. The Employment Agreement between Mr. Macgregor and MiMedx contained an implied covenant of good faith and fair dealing.

18. The Employment Agreement between Mr. Macgregor and MiMedx also contained an express covenant of good faith and fair dealing.

19. Under the circumstances involved here, in which Mr. Macgregor's compensation was intended to be primarily a function of commissions based upon sales of MiMedx's products,

4

MiMedx was subject to a covenant of extreme good faith to act in such a way that would facilitate Mr. Macgregor's ability to earn those commissions.

20. MiMedx breached such covenants to Mr. Macgregor by assigning customers previously assigned to the account executive whom Mr. Macgregor was replacing to other MiMedx account executives, and by otherwise acting in ways that resulted in a reduction of the commissions that Mr. Macgregor could earn.

COUNT IV.
BREACH OF CONTRACT

21. On September 16, 2019, MiMedx, without cause, terminated Mr. Macgregor's employment.

22. In the period that Mr. Macgregor was employed by MiMedx, he received no complaints regarding his job performance, and he had been lauded by MiMedx for the high quality of his work.

23. Although MiMedx's stated reason for Mr. Macgregor's termination was that he "was not a good fit," that stated ground was a pretext or ruse to accomplish the termination based upon a malicious intent to harm Mr. Macgregor, that did result in harm to Mr. Macgregor without sufficient justification.

24. In the June 24, 2019, Employment Agreement, MiMedx committed itself to treat Mr. Macgregor "in good faith and fair dealing."

25. MiMedx's termination of Mr. Macgregor's employment was in breach of the express covenant of good faith and fair dealing contained in the Employment Agreement.

COUNT V.
RETALIATORY DISCHARGE

26. Upon being hired by MiMedx, Mr. Macgregor was given a copy of the MiMedx

Corporate Compliance and Ethics Plan. (the "Ethics Plan"). Relevant portions of the Ethics

Plan are attached as Exhibit 2.

The Ethics Plan, inter alia, states that:

a) it is MiMedx's policy to operate its business in compliance with applicable law, Federal, State and private healthcare program requirements, and the highest standards of business and professional ethics. See Ethics Plan at page 5.

b) if an employee is unsure of whether any action complies with MiMedx's policies or applicable law, he or she should present that question to a manager, and that if, at any time, any employee becomes aware of any apparent violation of the Ethics Plan, he or she must report it to his or her supervisor, and that no adverse action will be taken against an employee solely on the basis that he or she reported what he or she believed to be an act of wrongdoing or a violation of the Ethics Plan, whether or not the report ultimately proved to be well-founded. See Ethics Plan at pages 5 and 30.

c) it is MiMedx's policy to operate its businesses in strict compliance with all laws and regulatory requirements, and that, under no circumstances, shall an employee take any action on behalf of the Company that he or she knows or reasonably should know violates any applicable law or regulation. See Ethics Plan at page 7.

d) employees who fail to adhere to the Ethics Plan, or who fail to report any acts of non-compliance, will be subject to discipline. See Ethics Plan at pages 20 and 31.

27. Upon being employed by MiMedx, Mr. Macgregor was also given a document

entitled 'Policies at a Glance-A Guide to MiMedx Policies,' dated November 2010. A copy of

the 'Code of Business Conduct and Ethics' portion of that document is attached as Exhibit 3.

This Code of Business Conduct and Ethics states, inter alia, that:

a) "MiMedx is committed to upholding the highest possible standards governing the conduct of the Company's business. Certain standards or behavior are essential in protecting our Company, work environment and the reputation of MiMedx. Conduct that is immoral, unethical or illegal or which adversely affects the Company and its reputation and best interests will not be tolerated."

6

    b) "all employees must agree to abide by the standards of the Code of Business Conduct and Ethics."

    c) "all employees must obey all applicable laws, rules and regulations regarding the Company's business wherever it is conducted, and not to take any action, either personally or on behalf of the Company, that violates any such law or any other significant law or regulation."

28. The rights and obligations contained in the Ethics Plan and in the Code of Business Conduct and Ethics are a portion of Mr. Macgregor's employment agreement with MiMedx.

29. MiMedx terminated Mr. Macgregor's employment shortly after Mr. Macgregor had raised concerns with his supervisor and other MiMedx employees regarding the unethical and, in some aspects, illegal methods by which MiMedx and its prior account executive had conducted business with those clients then being served by Mr. Macgregor. Without limitation, Mr. Macgregor had learned, after beginning his employment with MiMedx, that the prior account executive's practices had included systematic violation of HIPAA. This issue arose in a conversation among Mr. Macgregor's supervisor, a representative of UNMH, and Mr. Macgregor. In that conversation, the parties discussed the fact that MiMedx's prior account executive had systematically been given access to patients' medical records and other confidential information, in connection with her sales of MiMedx products. After the meeting with the UNMH representative had concluded, Mr. Macgregor expressed to his supervisor his grave concerns about the ethics and legality of these practices.

30. Mr. Macgregor's complaints regarding such unethical and/or illegal conduct was primarily in furtherance of a public interest.

    The manner in which Mr. Macgregor voiced his concerns regarding what he reasonably believed to be unethical and/or illegal conduct of business practices was the manner stated in the Ethics Plan and in the Code of Business Conduct and Ethics.

31. Mr. Macgregor's termination also violated his contractual rights under that portion of the Ethics Plan that promised that no adverse action would be taken against Mr. Macgregor solely on the basis that he reported what he believed to be an act of wrong-doing or a violation of the Ethics Plan, whether or not the report ultimately proved to be well-founded.

32. MiMedx's termination of Mr. Macgregor's employment was in retaliation for Mr. Macgregor's raising issues regarding what he believed to be MiMedx's unethical and/or illegal business practices.

## COUNT VI.
## PRIMA FACIE TORT

33. Pleading in the alternative, Mr. Macgregor alleges that, if it should be found that Mr. Macgregor's termination was lawful under the terms of the Employment Agreement, then Mr. Macgregor should be entitled to recover under the theory of prima facie tort. In that regard, Mr. Macgregor states that the Defendant, in terminating Mr. Macgregor's employment, acted with an intent to injure Mr. Macgregor, that MiMedx's intentional termination of Mr. Macgregor resulted in injury to Mr. Macgregor, and that there is no justification or insufficient justification for MiMedx's conduct.

## DAMAGES

34. As a proximate and foreseeable result of MiMedx's wrongful conduct, Mr. Macgregor has and will suffer damages in an amount to be determined at trial. Such damages include, without limitation, lost income, lost benefits, and expenses of securing new employment. Such damages should be determined on a benefit of the bargain basis.

35. The actions of MiMedx have been willful, wanton and in reckless disregard of Mr. Macgregor's rights, such that punitive damages should be assessed against MiMedx in an

amount to be determined at trial.

37. Mr. Macgregor is entitled to pre-judgment and post-judgment interest pursuant to NMSA 1978, §56-8-3 and/or §56-8-4.

WHEREFORE, Mr. Macgregor seeks judgment against MiMedx for compensatory and punitive damages in amounts to be determined at trial, for pre-judgment and post-judgment interest, for costs and for such other and further relief as the Court may deem proper.

Respectfully submitted by:
FLOYD D. WILSON, P.C.

By: _____
Floyd D. Wilson
12480 Highway 14 N, Suite 105
Cedar Crest, NM 87008
(505) 286-4248, floydwilsonlaw@gmail.com



June 24, 2019

Mr. Gavin Macgregor
64 Zane Drive
Sandia Park, NM 87047

Dear Gavin:

I am pleased to confirm our offer of employment to you for the position of Account Executive on behalf of MiMedx Group, Inc. ("MiMedx" or "Company"), which employment is to commence on July 8, 2019. In this position you will report directly to Todd Serrano, Regional Sales Director.

Your initial base salary will be $3,653.84 (gross before deductions) per biweekly pay period, which is equivalent to the gross amount of $95,000 on an annualized basis. Your salary will be payable on a biweekly basis. Your future salary adjustments will be in accordance with Company policy and based upon individual and Company performance.

In your position, you will also be eligible to participate in the MiMedx Account Executive 2019 Commission Plan ("Commission Plan"). You will begin participating in the Commission Plan effective your first day of employment. The Commission Plan is a monthly plan which provides you the opportunity to earn commissions based on the achievement of stated monthly tissue-based and device-based revenue derived from pre-determined sources assigned to you within your geographic territory.

Earned commissions are paid to all eligible participants no later than thirty (30) days from the end of the month for which the commission is applicable. You must be in the active employ of the Company on the date of payment in order to receive any calculated commission amount in accordance with the Commission Plan.

You will be eligible to participate in the Company's medical, dental, vision, life insurance, and disability benefits programs the first day of the month following your first day of employment. You will be eligible to participate in the MiMedx Group 401(k) Plan effective the first day of the month following your first day of employment.



PLAINTIFF'S
EXHIBIT
1

*Innovations in Regenerative Biomaterials*

MiMedx Group, Inc. | 1775 West Oak Commons Ct NE | Marietta, GA 30062 | 770.651.9100 | Fax 770.590.3550 | www.mimedx.com

Each such benefit shall be provided in accordance with the terms of the applicable benefit plans, which may be revised at any time at the Company's discretion. A summary of the Company's benefits is enclosed for your review. More detailed benefits eligibility and enrollment information will be sent to you shortly after you begin employment.

This offer is contingent upon a favorable background investigation and pre-employment drug screen result. Once we receive your consent for background screening, you will receive an email from Pembrooke with instructions for the drug screen process and a Chain of Custody (COC) Registration number for specimen collection. Drug screenings must be completed within 48 hours of the Company's receipt of your executed consent for background screening.

The email from Pembrooke will also contain the addresses and phone numbers of the lab facilities closest to your home address. To find another lab facility that may be more convenient for you, please call 1-800-939-4782, Monday – Friday from 6am to midnight (CST). No appointments are necessary. Please make sure that you bring the COC Registration number and photo identification, such as your driver's license.

The Company is committed to the highest standards of integrity and to treating its customers, employees, fellow workers, business partners and competitors in good faith and fair dealing. We expect employees to share the same standard and values. By accepting this offer, you agree that throughout your employment, you will observe all of the Company's rules governing conduct of its business and employees, including its policies protecting employees from illegal discrimination and harassment, as those rules and policies may be amended from time to time.

On-going Training and Education is a hallmark of the Company's success. To best serve physicians and their patients, our sales professionals must possess a solid understanding of the clinical and economic effectiveness and the scientific foundation of the Company's products. Our sales professionals are also expected to sustain updated sales skills in competencies such as territory planning, sales strategies and tactics, and competitive intelligence relative to the specific market(s) he/she serves as well as competitive product differentiation. Initially within the first few weeks of employment, you will be attending a comprehensive training and education program, and throughout your MiMedx career, you will be attending other training and education programs. As a contingency of employment, all MiMedx employees are expected to successfully complete the Company's training and education programs.

As an employee of MiMedx, you are prohibited from the use or disclosure of confidential information or trade secrets obtained from your past employers. If you have any such documents in your possession, you are expected to return them to the respective organization, and during the course of your employment with the Company, not bring onto MiMedx premises or utilize in any manner such documents, confidential information or trade secrets. While you have not made the Company aware of any such information in your possession, we urge you to abide by this prohibition if such information is currently in your possession.

This offer of employment is contingent on the absence of any restrictive covenants that would prevent you from conducting the duties and responsibilities of your position with MiMedx. By your acceptance of this offer, you represent that you have provided MiMedx with a copy of relevant past (or present if currently employed) employer's non-disclosure, restrictive covenant or inventions assignment

*Innovations in Regenerative Biomaterials*

MiMedx Group, Inc.  |  1775 West Oak Commons Ct NE  |  Marietta, GA 30062  |  770.651.9100  |  Fax 770.590.3550  |  www.mimedx.com

agreements that are in your possession, and you have advised us that these are the only such agreements with your past or current employer to which you are a party. As confirmation of this fact, upon the submittal of your resignation from your current employer, you are to request a copy of all such agreements that you may have executed with your current employer and provide a copy of each to MiMedx. We expect you to abide by the terms of any such agreements during your employment with MiMedx. If you become aware of any other restrictive covenant agreements to which you are a party, by your acceptance of this offer, you agree to provide us with a copy of such additional agreements.

By your acceptance of this offer, you acknowledge and agree to the following:

1. You have not taken any documents, files, information (whether hard copy or electronic), programs, or any other property belonging to your current or prior employers in violation of any agreement or law, and will not do so, and will return any documents, files, information and programs belonging to your current employer that is in your possession upon termination of your employment;

2. You have kept and will keep in confidence proprietary and confidential information acquired during your employment with your current and prior employers in accordance with all applicable agreements and law and you will not disclose to MiMedx or induce MiMedx to use any confidential or proprietary information belonging to any prior employer in violation of any such agreement or law;

3. You have not improperly downloaded, copied or accessed any programs, files, databases, applications or other electronically stored information belonging to your current or any former employer, and will not do so;

4. You have not suggested to any current colleagues that they resign from your current employer and you have not recruited any of your current colleagues to join MiMedx and will not do so during any period in which you are restricted by your current or past employers; and

5. You have not solicited any customers of your current employer to move their business relationship to MiMedx and will not do so prior to the end of your employment with your current employer and subsequent commencement of employment with MiMedx; and

6. Upon your first day of employment with MiMedx, a) you will be entirely free from any employment obligations or relationships with any other organization; b) your full time employment with MiMedx will not overlap in any manner with any active or inactive employment status with another company and c) you have fully disclosed to MiMedx any potential breach of this condition of your employment.

As a condition of your employment, you will be required to sign and comply with the enclosed MiMedx Confidentiality and Non-Solicitation Agreement, MiMedx Employee Inventions Assignment Agreement, and MiMedx Non-Competition Agreement. If the provisions of this offer are agreeable to you, please sign this letter to indicate your acceptance and return one copy along with the above-referenced agreements in the enclosed self-addressed envelope.

*Innovations In Regenerative Biomaterials*

MiMedx Group, Inc.  |  1775 West Oak Commons Ct NE  |  Marietta, GA 30062  |  770.651.9100  |  Fax 770.590.3550  |  www.mimedx.com

Gavin, I am delighted to extend this offer to you and look forward to an exciting and mutually rewarding business association. We look forward to your joining MiMedx. Please feel free to contact me via email or telephonically at 770-651-9155 if you have any questions.

Sincerely,

Tripp Smallwood
Senior Director, Talent Acquisition

cc:     Kevin Lilly
        Lee Ann Lawson
        Nick Andolino
        Will Lenz
        Todd Serrano

**ACCEPTANCE**

*I have read and understand the foregoing which constitutes the entire and exclusive agreement between the Company and the undersigned and supersedes all prior or contemporaneous proposals, promises, understandings, representations, conditions, oral or written, relating to the subject matter of this agreement. I understand and agree that my employment is at-will and is subject to the terms and conditions contained herein.*

_____                _____
Gavin Macgregor                                                  Date

*Innovations In Regenerative Biomaterials*

MiMedx Group, Inc.  |  1775 West Oak Commons Ct NE  |  Marietta, GA 30062  |  770.651.9100  |  Fax 770.590.3550  |  www.mimedx.com



| MiMedx | Corporate Compliance And Ethics Plan | |
|---|---|---|
| **Department:** Corporate Compliance | **Policy Number:** CC-00-01 | **Approval:** Deborah Dean (Executive Vice President), Roberta McCaw (General Counsel) |

# CORPORATE COMPLIANCE AND ETHICS PLAN

This document may not be copied or otherwise reproduced for purposes other than the internal use of **MiMedx Group, Inc.** without the express, written authorization of **MiMedx Group, Inc.**

Approved by the Board 02/01/2013

**PLAINTIFF'S EXHIBIT**
2

*Confidential & Proprietary*

*This document is the property of MiMedx Group, Inc. No unauthorized duplication or transmission is allowed without MiMedx's express written consent.*

| MiMedx | Corporate Compliance And Ethics Plan | |
|---|---|---|
| **Department:** Corporate Compliance | **Policy Number:** CC-00-01 | **Approval:** Deborah Dean (Executive Vice President), Roberta McCaw (General Counsel) |

## A.   INTRODUCTION

### 1.   Purpose of the Compliance and Ethics Plan

It is MiMedx's policy to operate its business in compliance with applicable law, Federal, State and private health care program requirements and the highest standards of business and professional ethics.

To further its commitment to compliance, MiMedx has established a Corporate Compliance and Ethics Plan. The Plan is directed by a Corporate Compliance Officer, who is charged with overseeing and monitoring the implementation of the Plan.

This Compliance Plan includes a Code of Conduct, which is a statement of MiMedx's policy in a number of specific areas. All employees and agents must comply with these policies, which define the scope of employment. Conduct that does not comply with these policies is not authorized by MiMedx, is outside the scope of employment and may subject employees to disciplinary action. If an employee is unsure whether any action complies with MiMedx's policies or applicable law, he or she should present that question to a manager, or, if appropriate, directly to the Corporate Compliance Officer (or any Deputy Corporate Compliance Officer appointed pursuant to the Plan), the Human Resources Department or MiMedx's General Counsel. All employees should review the Code of Conduct from time to time to make sure that these policies guide their actions.

If at any time, any employee becomes aware of any apparent violation of these policies, he or she must report it to his or her supervisor, the Corporate Compliance Officer (or any Deputy Corporate Compliance Officer appointed pursuant to the Plan), the Human Resources Department, MiMedx's General Counsel or the Chairman & CEO or President & COO. All persons making such reports are assured that such reports will be treated as confidential except as required by law; such records will be shared only on a bona fide need-to-know basis. No adverse action will be taken against an employee solely on the basis that he or she reported what he or she believed to be an act of wrongdoing or a violation of these policies, whether or not the report ultimately proves to be well founded.

This Compliance Plan is intended to establish a framework for compliance. It is not intended to set forth all of MiMedx's programs and practices that are designed to achieve compliance. Accordingly, this Compliance Plan deals only generally with some of the more important legal principles. Their mention is not intended to minimize the importance of other applicable laws, professional standards or ethical principles that may be covered in other institutional policies. This Compliance Plan is complemented by many detailed policies and procedures that promote conformance with the general standards of conduct and procedures set forth in the Plan.

### 2.   Changes to the Plan

This Plan was designed with the expectation that it will be modified to accommodate changes in the law and when otherwise necessary and MiMedx will regularly audit and monitor the Plan to assure its effectiveness. MiMedx therefore encourages comments and suggestions from employees and other agents who believe that the

*Confidential & Proprietary*

*This document is the property of MiMedx Group, Inc. No unauthorized duplication or transmission is allowed without MiMedx's express written consent.*

| MiMedx | Corporate Compliance And Ethics Plan | |
|---|---|---|
| **Department:** Corporate Compliance | **Policy Number:** CC-00-01 | **Approval:** Deborah Dean (Executive Vice President), Roberta McCaw (General Counsel) |

## B.    CODE OF CONDUCT

This Code of Conduct applies to all employees, officers and directors of MiMedx Group, Inc. MiMedx's continued success and reputation are dependent upon each employee, officer and director adhering to the highest ethical and legal standards of business conduct. Set forth in this document is MiMedx's policy with respect to the Company's standards of conduct and the obligations of employees, officers and directors to avoid conflicts of interest and to comply with all laws and regulations applicable to MiMedx and its businesses. These statements are reminders of each employee's, officer's and director's obligations and are neither exclusive nor exhaustive. Inevitably situations will arise to which no reference is made in this Policy. It is expected that each employee, officer and director will have the sensitivity to recognize when he or she is in a situation that raises ethical or legal questions and to seek advice from a manager, the Corporate Compliance Officer or any Deputy Corporate Compliance Officer, the Human Resources Department, or the Company's General Counsel.

The general compliance standards of conduct described below are intended to be supplemented by more detailed policies and procedures, and it is expected that the standards of conduct and the supplementary policies and procedures will from time to time be modified to reflect changing concerns.

As used in this code, the term "employee" shall include directors, officers and employees.

### 1.    Compliance with Laws and Regulatory Requirements

MiMedx's policy is to operate its businesses in strict compliance with all laws and regulatory requirements. Under no circumstances shall an employee take any action on behalf of the Company that he or she knows or reasonably should know violates any applicable law or regulation. Every employee is expected to be familiar with the basic legal and regulatory requirements that apply to his or her duties on the job. Employees who need help to understand his or her legal obligations are expected to ask a manager or a Company attorney for instruction or advice.

### 2.    Government Investigations

MiMedx's policy is to cooperate fully with government investigations. During any government inspection or investigation, an employee should never destroy or alter any MiMedx documents, lie or make misleading statements to a government investigator, attempt to cause another employee to fail to provide accurate information and/or obstruct, mislead or delay the communication of information or records to any governmental authority. If an employee receives any inquiry from a government investigator, he or she should immediately notify his or her manager and the Company's Corporate Compliance Officer or General Counsel. Employees should not provide MiMedx documents to any government entity in response to such a request without the prior approval of the Corporate Compliance Officer and the General Counsel. Certain laws guarantee individuals a right to be represented by legal counsel during an investigation or inquiry by a governmental agency. In view of the technical nature of these investigations, MiMedx believes that it should be represented as well.

*Confidential & Proprietary*

*This document is the property of MiMedx Group, Inc. No unauthorized duplication or transmission is allowed without MiMedx's express written consent.*

| MiMedx | Corporate Compliance And Ethics Plan | |
|---|---|---|
| **Department:**<br>Corporate Compliance | **Policy Number:**<br>CC-00-01 | **Approval:**<br>Deborah Dean (Executive Vice President),<br>Roberta McCaw (General Counsel) |

### 3.      Protection of Employees

It is the policy of MiMedx that no employee shall be punished solely on the basis that he or she reported what he or she reasonably believed to be an act of wrongdoing or a violation of this Plan or MiMedx Code of Ethics. Furthermore, MiMedx is committed to following the protections set forth in Title 31 U.S.C. Section 3730(h), and, to the extent reasonably possible, preserving the anonymity of an employee or agent who reports wrongdoing.

An employee will be subject to disciplinary action, however, if MiMedx reasonably concludes that the report of wrongdoing (a) was knowingly fabricated by the employee, (b) was knowingly distorted, exaggerated, or minimized to either injure someone else or to protect himself/herself, or (c) directly involves the person reporting the wrongdoing.

In determining what, if any, disciplinary action may be taken against an employee, MiMedx will take into account an employee's own admissions of wrongdoing; provided, however, that the employee's admission was not previously known to MiMedx or its discovery was not imminent, and that the admission was complete and truthful. An employee whose report of misconduct contains admissions of personal wrongdoing will not, however, be guaranteed protection from disciplinary action. The weight to be given the self-confession will depend on all the facts known to MiMedx at the time it makes its disciplinary decisions.

*Confidential & Proprietary*

Effective Date:

07/20/2014

Revision Number:

1

This document is the property of MiMedx Group, Inc. No unauthorized duplication or transmission is allowed without MiMedx's express written consent.

*Innovations in Biomaterials*

Policies at a Glance

A Guide to
MiMedx Policies

PLAINTIFF'S
EXHIBIT

3

November 2010

MiMed

## PREFACE

This brochure summarizes and highlights certain information contained in the MiMedx Group, Inc. ("MiMedx" or the "Company") Human Resources Policy Manual. The purpose of this brochure is to provide our employees with a convenient overview of the topics and kind of information contained in the Company's Human Resources policies and procedures. This brochure presents only general information about the Company's employment policies and guidelines. Not all Company policies and procedures are highlighted in this brochure, and not all of the content of the highlighted policies and procedures are set forth in this brochure. The highlights presented in this brochure are not intended to encompass or anticipate every situation, answer every question or solve every problem involving employment with MiMedx. Employees should (a) review the Human Resources Policy Manual that is available electronically for employees to access and / or (b) consult with their supervisor, manager or Human Resources regarding any questions about this brochure or the Company's Human Resources Policy Manual.

The Company reserves the right to change, modify, suspend, interpret, or cancel in whole or in part, any and all provisions of the policies, procedures, and rules of conduct highlighted in this brochure or their application. The Company may do so as it deems appropriate, with or without advance notice, in its sole discretion, without having to give cause or justification. The highlights reflected in this manual should not be construed as contractual conditions of employment, nor in any way interpreted to include a promise of continued employment.

## BACKGROUND INVESTIGATIONS

The Company will utilize a standard requirement and process for obtaining and evaluating background information and drug screens as a condition of employment. Offers of employment will be contingent upon obtaining an application and a background investigation through the Human Resources Department. If the results of the background investigation are unfavorable, the individual will be denied employment, or if employment has commenced, the individual's employment will be terminated.

### CONDITIONAL JOB OFFERS

All prospective employees must fill out a pre-employment application and respond to all questions therein.

Qualified individuals deemed to be the best candidate for a position will be extended an offer of employment contingent upon, at a minimum, the completion of a background investigation and satisfactorily passing a drug screen. Such qualified individuals shall be informed that a background investigation and drug screen, among other requirements, are conditions of employment for the position sought, and a consent form for a background investigation must be completed and signed by the individual.

## CODE OF BUSINESS CONDUCT AND ETHICS

MiMedx is committed to upholding the highest possible standards governing the conduct of the Company's business. Certain standards of behavior are essential in protecting our Company, work environment and the reputation of MiMedx. Conduct that is immoral, unethical or illegal or which adversely affects the Company and its reputation and bests interests will not be tolerated.

This policy is presented to all employees in the form of the agreement exhibited below. All employees must read the agreement and agree to abide by the standards of this policy and agreement through the execution of the agreement. The execution of this agreement is an initial condition of employment for all employees.

The content and procedures for compliance with this policy are contained in the agreement exhibited below:

54

# MIMEDX GROUP, INC.

## CODE OF BUSINESS CONDUCT AND ETHICS

## This Code of Business Conduct Applies to All Directors, Officers and Employees

This Code of Business Conduct and Ethics (the "Code") applies to all directors, officers, and employees of MiMedx Group, Inc. and its subsidiaries (together, the "Company"). It also applies to all directors, officers, and employees of the Company's controlled affiliates and employees who serve as directors or officers (or an equivalent position) of any non-controlled affiliate.

This Code is part of the terms and conditions of each employee's employment with the Company; provided, however, the Code does not create an express or implied employment contract and is not intended to be interpreted as a contract. To the contrary, it presents guidelines and constitutes a statement of principles to which all of us are held accountable.

The Company is committed to the highest standards of ethical and professional conduct. This Code establishes basic standards of business practice, as well as professional and personal conduct, which are expected of all directors, officers, and employees. These standards require honesty and candor in the Company's activities. The Company expects all directors, officers, and employees to abide not only by the "letter" but also the "spirit" of the Code.

*This Code also sets forth procedures for bringing complaints or issues before management or the Audit Committee on a confidential, anonymous basis. You should review the procedures carefully.*

### Basic Principles of Ethical Corporate Conduct

Because the Company is judged by the performance and public perception of its directors, officer, and employees, each director, officer, and employee has a responsibility always to act in a manner that merits public trust and confidence consistent with the highest standards expected of directors, officers, and employees of a publicly owned corporation.

The principles set forth below are basic principles that must be followed:

1. Be honest, fair and trustworthy in all relationships in carrying out your duties for the Company.

2. Avoid actual and apparent conflicts of interest between work and your personal interests, and if there are any such conflicts or potential conflicts, seek

approval beforehand from the Company's General Counsel, or if you are an officer, from the Audit Committee of the Board of Directors.

3.  Obey all applicable laws, rules and regulations governing the Company's business, wherever it is conducted, and do not take any action, either personally or on behalf of the Company, that violates any such law or any other significant law or regulation, the violation of which would reflect poorly on you or the Company. Do not take advantage of the Company, its employees, customers, vendors, or suppliers or any other third parties.

4.  Treat the Company's property and funds with the same care and respect you would treat your own property and funds. The Company's property and funds belong to its stockholders. Do not improperly charge and do not fail to charge for services the Company renders.

5.  Foster an atmosphere in which personal integrity and fair dealing is part and parcel of what you do.

6.  Be honest and candid with regard to all reporting of financial results. Be timely and accurate in all your reporting; do not change or fudge numbers or facts to make yourself or someone else look better.

7.  Be loyal to the Company. Do not (i) deprive the Company of an opportunity; (ii) take for your own advantage an opportunity that belongs to the Company; or (iii) help others violate (i) or (ii), if they are in a position to divert a Company opportunity for their own benefit.

8.  Keep confidential information about the Company and its customers, which may include pricing, research, intellectual property, Company or customer financial information, the identity of customers or suppliers, trade secrets, and proprietary information confidential, both while you are employed and after you leave the Company, and do not use any such information for your personal advantage or for the benefit of the Company's competitors.

9.  All employees and representative of the Company should understand the legal and ethical issues associated with gifts and entertainment and how they can affect our relationship with our customers, suppliers, and the general public. The decision to offer or accept gifts or entertainment should be made only in compliance with legal requirements and ethical considerations, and with the involvement of a manager if unsure of the appropriate course.

The issue of gifts and gratuities may have legal implications when the government, or government entity is involved, and serious consequences can result from mishandling these relationships. Offering or accepting bribes or pay-offs is always prohibited.

Business gifts and entertainment are courtesies designed to build goodwill and sound working relationships among business partners. We do not, however, want to obtain business through improper means as to gain any special

56

advantage in a relationship. Business gifts that compromise, or even appear to compromise, our ability to make objective and fair business decisions are inappropriate. Gifts from a subordinate to a superior should be limited to reasonable gifts given in recognition of a commonly celebrated occasion or event.

10. Treat all persons fairly, regardless of such factors as race, religion, gender, disability, age or national origin. Adhere to fair employment practices. Extend courtesy to every employee, customer, vendor, and supplier of the Company.

11. Be thoroughly familiar with, adhere to and fully comply with all Company policies and procedures, including, without limitation, this Code, the Company's Insider Trading Policy, the Company's Reporting Procedures for Accounting Matters, and other standards of conduct.

12. Conduct business in a way that protects the health and safety of the Company employees, other people, and the environment. Employees should act in a manner that ensures compliance with all applicable governmental and private health, safety, and environmental requirements, including contributing to an alcohol- and drug-free workplace.

13. Invest the time necessary to learn your job thoroughly and learn from your colleagues who have more experience in the Company's business.

14. Promptly report to your supervisor or the General Counsel (or, if appropriate, the Audit Committee) any irregularities or apparent wrongdoing, including violations of the matters listed in this section and all facts surrounding any such incident.

15. Do not withhold, misrepresent or misconstrue facts or information when reporting any matter to your supervisor or superior or reporting violations of this Code or any other standards of conduct to your supervisor, the General Counsel or the Audit Committee.

16. Any Company employee who is in possession of material, non-public information concerning the Company's financial condition, operations, properties or prospects may not purchase or sell the Company's stock until two (2) business days after that information has been publicly disclosed. Material, non-public information is information about the Company an investor would consider important that has not been publicly disclosed, either by the Company or otherwise.

## EXAMPLES OF CONDUCT THAT VIOLATES THIS CODE

The following are examples of conduct that violates this Code:

- Acts of dishonesty and/or embezzlement, including borrowing money from the Com-

pany without approval of a senior officer or using Company property for personal use or personal gain.

- Accepting or giving bribes or kickbacks to or from the Company's customers, vendors, or suppliers.
- Making favorable freight arrangements for customers that result in you obtaining a personal benefit.
- Misusing Company property.
- Abusing or misusing property belonging to customers, vendors, suppliers, and other third parties.
- Looking up or obtaining information on workstation screens, company records or elsewhere about the Company's financial or proprietary information, unless there is a business need to do so that has been expressly approved by your supervisor.
- Using Company information for your own benefit or to benefit someone else, either directly or indirectly.
- Trading in the Company's stock while in possession of important inside information about the Company that has not been publicly disclosed.
- Falsifying or destroying Company records or documents except as part of a normal and previously approved record destruction program.
- Failing to report any matters accurately or timely to a supervisor or superior or misrepresenting or misstating facts in any oral or written report.
- Failing to report wrongdoings to senior management.
- Performing work for a person or entity that has a business relationship with the Company or for a person or entity that competes with the Company without prior approval of management.

The examples above are not all-inclusive, and the Company reserves the right to determine if and when conduct constitutes a violation of this Code, whether or not the conduct is specifically identified.

## WHERE TO GET MORE INFORMATION

If you do not understand or have any questions about any portion of this Code, you should contact the General Counsel. You may contact the General Counsel by phone (678) 384-6720, in person or via e-mail: compliance@mimedx.com.

## WHO HANDLES COMPLAINTS

If you believe that you or someone else may be in violation of the Code, you may submit

58

your complaints, reports, or concerns, on a confidential and anonymous basis as follows:

    (i)    writing or orally notifying the Company's General Counsel, your supervisor or an officer of the Company; or

    (ii)    writing to the Chairperson of the Audit Committee of MiMedx Group, Inc., 811 Livingston Court SE, Suite B, Marietta, Georgia 30067, in an envelope with a legend such as "To be opened by the Audit Committee."

*The Company forbids retaliation, and no action will be taken against you for asking in good faith about the Code, about activities that you are considering engaging in or for reporting in good faith a perceived violation of the Code, even if it turns out that there was in fact no violation.*

## REPORT OF MATTERS TO AUDIT COMMITTEE

When an issue is raised pertaining to the Code, the Chief Financial Officer will take appropriate action under the circumstances; provided, that the Chief Financial Officer shall report all matters to the Chairperson of the Audit Committee relating to any (i) alleged violation of the Code by any director, executive officer, or any Designated Officer (as defined below) (the "Alleged Code Violation"), (ii) complaints, reports, or concerns regarding financial statement disclosures, accounting, internal accounting controls, or auditing matters (collectively, "Accounting Matters"); (iii) violation of applicable securities laws, rules, and regulations relating to financial reporting (a "Legal Allegation"); (iv) retaliation against any employees who make any allegations relating to (i) , (ii) or (iii) above (a "Retaliatory Act"); and (v) other matters required to be addressed by the Audit Committee (A) set forth in the Reporting Procedures for Accounting Matters, the Charter of the Audit Committee (the "Charter"), or otherwise, and (B) pursuant to all applicable laws, rules, and regulations.

The Audit Committee has the continuing duty to review the performance of the Company's Chief Financial Officer and other members of the financial management staff and to provide independent and skilled guidance to the Board of Directors in fulfilling its responsibilities and to ensure the fairness and accuracy of the Company's Accounting Matters. Pursuant to Section 301 of the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder and its Charter, the Audit Committee established reporting procedures for the receipt, retention and treatment of complaints (collectively, a "Complaint") received by the Company and Audit Committee on issues regarding Alleged Code Violations and Accounting Matters as well as other matters.

A copy of the Reporting Procedures for Accounting Matters is available on the Company's website (www.mimedxgroup.com) under Investor Relations.

## PROCEDURE

Complaints may be made to the Company anonymously pursuant to the section titled, "Who Handles Complaints." If the Compliant is, or is required to be, addressed by the Audit Committee, then the Audit Committee will take the following actions upon receipt of such Complaint:

- The General Counsel  and Chairman of the Audit Committee will review the Complaint and determine whether the full Audit Committee needs to review.
- The Audit Committee will determine, in its sole discretion, whether the matters set forth in the Complaint relate to or involve a material violation of this Code or any Company policy or have a material adverse effect on the Company's financial statements, results of operations or financial controls.
- The Audit Committee may investigate the matters alleged in any Complaint by any procedure it deems appropriate.
- The Complaint, if it involves a material matter, will be reviewed by the Company's independent public accountants or outside legal counsel, or both, as appropriate, and the Audit Committee will take any necessary action to remedy the matters set forth in the Complaint, including, without limitation,
- presenting such Complaint to the Company's Board of Directors for further action if the Audit Committee determines there is substance to the matters alleged in the Complaint.
- Complaints that are not well-founded will be dismissed, but such Complaints will be retained by the Audit Committee for an appropriate period of time, as determined by the Audit Committee.
- No employee will be subject to discipline for bringing a Complaint in good faith to the Audit Committee's attention.

Notwithstanding anything to the contrary herein, any Complaints relating to Accounting Matters, Alleged Code Violations, Legal Allegations or a Retaliatory Act shall be subject to the procedures set forth in the Reporting Procedures for Accounting Matters.

Any Complaints received by the Audit Committee (or the Company's outside legal counsel) will be retained in a separate, confidential file restricting access only to members of the Committee and the Company's outside legal counsel.

60

## CODE OF ETHICAL CONDUCT WAIVERS

A waiver of any of the rules of the Code must be requested in writing. Any waiver will be denied or granted in the sole discretion of the Company or the Audit Committee as appropriate. The General Counsel has authority to grant a waiver for employees who are below the rank of Vice President, subject to approval of the Audit Committee of the Board of Directors. Waivers of any provision of the Code for Designated Officers, executive officers, or directors, as well as any changes to the Code, shall be approved by the Company's Board of Directors and reported or disclosed in accordance with the applicable requirements of the Securities and Exchange Commission and National Association of Securities Dealers, Inc.

All waivers of this policy must be reported to the Audit Committee.

## FAILURE TO COMPLY

Engaging in prohibited conduct or not adhering to this Code, or any other standards of conduct adopted by the Company, may lead to disciplinary action against an employee, which may include, without limitation, a warning or letter of reprimand, demotion, salary reduction, loss of eligibility for a salary increase, bonus, or equity compensation, suspension without pay, or termination of employment. If you have any questions or doubts about whether your conduct might pose a conflict or a potential conflict of interest or be otherwise prohibited, refer the matter to your immediate supervisor or the General Counsel.

## SPECIAL PROVISIONS RELATING ONLY TO PRINCIPAL, EXECUTIVE OFFICER AND SENIOR FINANCIAL OFFICERS

The Sarbanes-Oxley Act of 2002 and the rules and regulations of the Securities and Exchange Commission issued pursuant thereto require the Company to disclose in its annual report whether it has adopted a code of ethics for its principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions (the "Designated Officers"). For purposes of this requirement, the code of ethics means a codification of standards that is reasonably designed to deter wrongdoing and to promote:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission

and in other public communications made by the Company;

- compliance with applicable governmental laws, rules, and regulations;

- the prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and

- accountability for adherence to the Code.

All provisions of the Code apply to the Designated Officers. In addition, each Designated Officer shall be responsible for the full, fair, accurate, timely, and understandable disclosure in reports and documents that a Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company.

Any Designated Officer who is found to have violated any provision of the Code, including any of the special provisions set forth herein, will be, at the discretion of the Company's Board of Directors, subject to disciplinary action, which may include, without limitation, a warning or letter of reprimand, demotion, salary reduction, loss of eligibility for a salary increase, bonus, or equity compensation, suspension without pay or termination of employment.

## PUBLIC AVAILABILITY

This code will be made publicly available in accordance with the applicable requirements of the Securities and Exchange Commission on the Company's website (www.mimedxgroup.com) under "Investor Relations."

## INSIDER TRADING & CONFIDENTIAL INFORMATION

Directors, officers and employees of MiMedx Group, Inc., MiMedx Inc., or SpineMedica, LLC, or any other subsidiary of MiMedx Group, Inc. (collectively, the "Company") will, in the course of performing their duties, come into possession of information regarding the Company and its subsidiaries (and possibly other unaffiliated corporations) which is not generally available to the investing public. Examples of such "inside information" include (i) the possibility or terms of proposed mergers, acquisitions or divestitures, (ii) proposals to increase or reduce dividends, (iii) operating results (favorable or unfavorable) of a just completed fiscal quarter or year, (iv) financial projections, (v) changes in top management or control, (vi) major new contracts, (vii) clinical trial information, (viii) technology developments, (ix) significant litigation and

62

(x) other important business developments or prospects. The laws relating to the disclosure of such information and the responsibilities of individuals in possession thereof must be complied with at all times. The purpose of this Policy is to set forth the basic Company requirements for directors, officers and employees who might be in possession of "material inside information".

## OUTLINE OF PRESENT DISCLOSURE LAWS.

Rule 10b-5 under the Securities Exchange Act of 1934 and certain other federal securities law provisions prohibit the misstatement of, or failure to disclose, a material fact in connection with the purchase or sale of securities. As a consequence of these provisions, if there are purchases or sales of a company's securities by persons possessing material inside information not known to the public, such transactions may give rise to private lawsuits for damages or to civil and criminal proceedings by the SEC. Similarly, participation (or acquiescence) by an officer, director or employee in a material misrepresentation or failure to disclose may, in some circumstances, subject such individual to liability for civil or criminal penalties. Liability may be imposed upon the Company, its directors, officers, employees and other insiders, who are the source of leaks of material information not yet disclosed to the public, which coincides with purchases or sales of the Company's securities (i) by such insiders or outsiders, (ii) by the Company itself or (iii) by "tippees" (including family members — and others — living in your home, other relatives, friends, stockbrokers, investment analysts, etc.). Penalties may include (i) a civil penalty of up to three times the profit gained or loss avoided; (ii) a criminal fine of up to $1,000,000 per violation; and (iii) a jail term of up to ten years. In addition, a company that fails to take appropriate steps to prevent illegal trading is faced with (a) a civil penalty of the greater of $3,000,000 or three times the profit gained or loss avoided, and (b) a criminal penalty of up to $2,500,000. Furthermore, the use of "material inside information" to gain personal benefit is just as illegal with respect to a few shares of stock as it is with respect to a large number of shares. Neither the SEC nor the NASD ignores "minor violations" or gives breaks to "little guys". The SEC regional office in Atlanta is well-staffed and aggressive.

Moreover, if a Company employee violates the Company's insider trading policy, severe Company-imposed sanctions, including possible dismissal for cause, will result. Any of the above consequences, or even an SEC investigation that does not result in prosecution, could tarnish an individual's reputation and substantially damage a career.

Material information has been defined as information that could be expected to affect the investment decision of a reasonable investor or to alter significantly the market price of the stock. Obviously, it is difficult to determine materiality, and the facts in each case must be care-

fully weighed. Certainly, if the information makes you want to buy, sell or hold your stock, it would probably have the same effect on others. The source of the information is irrelevant. Furthermore, it should be remembered that plaintiffs who challenge and judges who rule on particular transactions have the benefit of hindsight.

Information should be considered non-public if it has not been disseminated in the Company's annual or periodic reports to stockholders, has not been the subject of a widely disseminated press release intended for and made available to the public, or has not been widely reported in the media, market letters, statistical services or the like. Even when information has been disclosed to the public, as by a press release, Company personnel should allow 48 hours for the information to be disseminated and analyzed by the public prior to trading.

**To repeat, material, non-public information may not be disclosed to anyone, including friends, family members (and others) living in your home, other relatives and acquaintances, except for Company personnel who have a clear right to know the information in order to fulfill their responsibilities.** The Company takes great care in protecting its confidential and proprietary information. Much of this information, if improperly disclosed, could have damaging consequences to the Company and its stockholders.

### TRADING GUIDELINES

Investment by directors, officers and employees in the Company's stock is generally desirable and is not to be discouraged. However, such investment should be made with extreme caution, and with the recognition of the legal prohibitions against the use by corporate "insiders" of confidential information for their own profit. **Moreover, individuals who acquire MiMedx Group stock should only do so as a long-term investment.** Regular buying and selling is likely to give rise to an inference that one is trading on inside information. Such frequent trading may also increase the risk that the insider will inadvertently purchase or sell stock when material information regarding the Company is about to be released. In addition, no one should consider acquiring or selling MiMedx Group stock simply because another Company employee has expressed an opinion on the matter. Each employee should be aware that other employees have different financial circumstances, financial goals and risk tolerance. Accordingly, as difficult as **it may be, employees should use care in commenting to one another regarding investments in MiMedx Group stock.**

No trading on inside information.

64

**You may not trade if you have knowledge of material information about the Company which has not been made widely available to the investing public.** Similarly, if in the course of your work with the Company you become aware of undisclosed material information about a public company which has a relationship with the Company, you may not trade in that company's securities. If you have any question whether information you possess may be material or whether the information has been widely disseminated, you must discuss the matter with the Chief Executive Officer or Chief Financial Officer of MiMedx Group. Once material information has been made public, you must wait at least 48 hours to trade.

No Trading During "Blackout Periods".

<u>Routine Blackout Period – Applicable to Covered Persons</u>. The routine blackout period begins one week before the end of each quarter and continues until the beginning of the third business day following the public release of quarterly and annual financial results. The employees who are subject to this trading restriction are (i) the members of the Board of Directors, (ii) all executive officers (those who report stock transactions on SEC Form 4), and (iii) employees who either report directly to executive officers or are in the finance and accounting department and have access to the Company's quarterly and annual financial statements before they are published. **During the routine blackout periods these covered persons may not trade in MiMedx Group stock.**

<u>Declared Blackout Periods – Applicable to all Employees</u>. **In addition to the above restrictions, you may not trade, without prior written permission, during any period which has been designated by the Company as a blackout period, whether or not you possess any material inside information about the Company.** You will be notified if a blackout period is declared under this Section.

<u>Exercise of Options and Purchases Under the Employee Discount Stock Purchase Plan During Blackout Periods</u>. The exercise of a vested stock option to purchase MiMedx Group stock, is not subject to the blackout period; **however, the subsequent sale of stock so acquired would be subject to trading restrictions.**

<u>Possible Exception for Rule 10b5-1 Plans</u>. Rule 10b5-1 plans are trading plans approved in advance by persons who do not at that time have material inside information. MiMedx Group's Chairman of the Board or Chief Financial Officer have discretion to permit transactions under Rule 10b5-1 plans that would otherwise be prohibited by this policy, if the plan is approved in advance.

<u>Required Approval of General Counsel</u>: Directors and executive officers must have the express consent of the Company's General Counsel prior to any purchase or sale of MiMedx Group shares or of a right to purchase or sell them. The Company's General Counsel may withhold consent if he or she believes that the proposed transaction is not in the best interests of the Company.

### GENERAL ASSISTANCE

Many Company personnel do not deal on a regular basis with the securities laws discussed in this policy statement and some of the matters may be unfamiliar. Furthermore, the analysis of the legal issues is not intuitive, and the law changes. If and when questions arise about any of the policies expressed herein, please direct inquiries to the Company's Chief Financial Officer or outside counsel.

This policy supersedes any previously issued policy regarding insider trading and confidential information but does not supersede or otherwise modify the provisions of existing agreements or other standard procedures or policies intended to protect confidential information and materials of the Company.

### NOTE TO DIRECTORS AND EXECUTIVE OFFICERS: SECTION 16

This memorandum does not address the requirement that Directors and Executive Officers report trades pursuant to Section 16(a) of the Securities Exchange Act of 1934, or the risk of liability for "short-swing profits." The Company will provide further information on this subject.